# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

No. 14-1025V

Filed: August 18, 2017

Not for Publication

```
*************************************
CHRISTOPHER PURVIS,                  *
                                     *
            Petitioner,              *
                                     *
v.                                   *
                                     *
SECRETARY OF HEALTH                  *
AND HUMAN SERVICES,                  *
                                     *
            Respondent.              *
                                     *
*************************************
```

## ORDER GRANTING PETITIONER'S MOTION FOR RECONSIDERATION AND CLARIFICATION[1]

On July 25, 2017, the undersigned issued a decision dismissing petitioner's petition for failure to make a prima facie case.  On August 14, 2017, petitioner filed a Motion for Reconsideration and Clarification.  In his motion, petitioner asks the undersigned to reconsider her July 25, 2017 decision, arguing that the undersigned did not properly consider the fact that autoimmune medications were prescribed to petitioner.  Petitioner further argues that petitioner's symptoms lasted more than six months and that there is no evidence that petitioner's discitis preceded his influenza vaccination.  Petitioner also requests clarification of the undersigned's July 25, 2017 decision.

---

[1] Because this unpublished Order contains a reasoned explanation for the special master's action in this case, the special master intends to post this unpublished Order on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). Vaccine Rule 18(b) states that all decisions of the special masters will be made available to the public unless they contain trade secrets or commercial or financial information that is privileged and confidential, or medical or similar information whose disclosure would constitute a clearly unwarranted invasion of privacy.  When such a decision is filed, petitioner has 14 days to identify and move to redact such information prior to the document's disclosure.  If the special master, upon review, agrees that the identified material fits within the banned categories listed above, the special master shall redact such material from public access.

Under Vaccine Rule 10(e)(2), the "special master may seek a response from the nonmoving party, specifying both the method of and the timing for the response." The undersigned gave respondent the opportunity to respond to petitioner's motion, but respondent's counsel said respondent did not plan on filing a response unless the undersigned ordered him to and clarifying that his lack of response does not mean that respondent agrees with petitioner's motion.

This matter is now ripe for adjudication.

## I.     Legal Standard

A party seeking reconsideration must "support the motion by a showing of extraordinary circumstances which justify relief." Fru-Con Constr. Corp v. United States, 44 Fed. Cl. 298, 300 (Fed. Cl. 1999). A motion for reconsideration must be based upon a "manifest error of law, or mistake of fact, and is not intended to give an unhappy litigant an additional chance to sway the court." Prati v. United States, 82 Fed. Cl. 373, 376 (Fed. Cl. 2008). Specifically, "the moving party must show: (1) the occurrence of an intervening change in the controlling law; (2) the availability of previously unavailable evidence; or (3) the necessity of allowing the motion to prevent manifest injustice." Matthews v. United States, 73 Fed. Cl. 524, 526 (Fed. Cl. 2006). Where a party seeks reconsideration on the ground of manifest injustice, the party must be mindful that "[m]anifest" means "clearly apparent or obvious." Ammex, Inc. v. United States, 52 Fed. Cl. 555, 557 (Fed. Cl. 2002). Accordingly, a party cannot prevail on the ground of manifest injustice unless the party demonstrates that the asserted injustice is "apparent to the point of being almost indisputable." Pac. Gas & Elec. Co. v. United States, 74 Fed. Cl. 779, 785 (Fed. Cl. 2006).

A motion for reconsideration will not be granted if the movant "merely reasserts . . . arguments previously made . . . all of which were carefully considered by the court." Ammex, 52 Fed. Cl. at 557. Nor will a motion for reconsideration be granted if it is "based on evidence that was readily available at the time" the matter was being decided. Seldovia Native Ass'n v. United States, 36 Fed. Cl. 593, 594 (Fed. Cl. 1996). Finally, an evaluation of a motion for reconsideration is to be "guided by the general understanding 'that, at some point, judicial proceedings must draw to a close and the matter deemed conclusively resolved.'" Northern States Power Co. v. United States, 79 Fed. Cl. 748, 749 (Fed. Cl. 2007) (quoting Withrow v. Williams, 507 U.S. 680, 698 (1993)).

## II.    Discussion

In support of his Motion for Reconsideration and Clarification, petitioner argues just one of the three bases, i.e., manifest injustice. Petitioner does not argue that there has been a change in the controlling law or that any previously unavailable evidence has become available. Petitioner argues that manifest injustice would result if the undersigned did not reconsider her decision. The undersigned doubts that manifest injustice would result in the dismissal of this case based on the testimony and evidence in the records. Moreover, in order for a Motion for

Reconsideration to be granted for manifest injustice, the injustice must be "apparent to the point of being almost indisputable." Pac. Gas & Elec. Co., 74 Fed. Cl. at 785. But in the spirit of liberality, the undersigned clarifies her dismissal decision and thus **GRANTS** petitioner's Motion for Reconsideration and Clarification. However, the reconsideration of the evidence of testimony in this case still compels the undersigned to **DISMISS** this case.

Dr. David Axelrod, petitioner's expert, is board-certified in allergy and immunology, rheumatology, and internal medicine. Tr. at 14. He is working part-time seeing patients with allergy problems. Tr. at 14, 61. About twenty percent of his patients have non-allergy problems. Tr. at 62.

Dr. Axelrod testified his "guess" is that the cause of discitis is infection. Tr. at 62-63. However, he would say discitis was part of an autoimmune disease if someone has ankylosing spondylitis or granulomatous vasculitis. Tr. at 66. Petitioner does not have ankylosing spondylitis or granulomatous vasculitis. (Petitioner filed into evidence two case reports dealing with Wegener's granulomatosis mimicking a thoracic spondylodiscitis (Exhibit 16) and spondylodiscitis as the only clinical manifestation of the onset of psoriatic spondyloarthritis (Exhibit 17). Wegener's granulomatosus is an autoimmune disease. Just because someone with Wegener's can have a condition mimicking spondylodiscitis does not mean that petitioner who had osteomyelitis/discitis has an autoimmune disease. The second case report dealing with spondylodiscitis as the only clinical manifestation of the onset of psoriatic spondyloarthritis interestingly involved treatment of the patient's spondylodiscitis with antibiotics because the patient's doctors regarded the cause as bacterial infection.)

Dr. Axelrod stated numerous times during his testimony that he is not an infectious disease expert. The fact that he trained as an immunologist, however, does not mean that all diseases are immunological. The strong impression the undersigned has is that the only way he could assist petitioner as his expert was to ignore his guess that the cause of discitis is infection and assert that petitioner had an autoimmune reaction to his flu vaccination.

Dr. Axelrod testified, "[Petitioner] had had the flu vaccine. We don't have proof of any other cause." Tr. at 46. However, it is clear that petitioner's treating doctors thought the cause of petitioner's discitis was an infection. According to Dr. Jeffrey A. Salkin who wrote the discharge summary before petitioner left Lawrence & Memorial Hospital on October 11, 2013 against medical advice, his treating doctors, said the plan for dealing with petitioner's discitis was intravenous antibiotics, an infectious disease consult, and a special procedure biopsy. Med. recs. Ex. 7, at 15. Petitioner said this was inconvenient for him and walked out of the hospital.

The Federal Circuit in Capizzano emphasized that the special masters are to evaluate seriously the opinions of petitioner's treating doctors since "treating physicians are likely to be in the best position to determine whether a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury." 440 F.3d at 1326. See also Broekelschen v. Sec'y of HHS, 618 F.3d 1339, 1347 (Fed. Cir. 2010); Andreu v. Sec'y of HHS, 569 F.3d 1367, 1375 (Fed. Cir. 2009). It is thus highly significant to the undersigned that petitioner's treating doctors

3

thought the cause of petitioner's discitis was an infection and designed a plan to determine which bacterium was the causing the infection so that they could treat petitioner appropriately with intravenous antibiotics.  Dr. Axelrod's opinion that the cause of petitioner's discitis was not an infection but flu vaccine flies in the face of petitioner's treating doctors' opinion.  Thus Dr. Axelrod's credibility wanes in the face of his assertion.

Moreover,  petitioner's expert Dr. Axelrod's opinion that flu vaccine caused petitioner's discitis because we do not have proof of any other cause is legally insufficient to make a prima facie case because his statement does not constitute affirmative evidence of vaccine causation.  See Grant v. Sec'y of HHS, 956 F.2d 1144, 1149 (Fed. Cir. 1992).

Attempting to offer affirmative proof of causation, Dr. Axelrod testified that there are hemagglutinin and neuraminidase in flu vaccine that have components similar to cartilage in the spinal discs, one of the components being GM3.  The undersigned asked how much homology of these components with cartilage is necessary in order to cause someone's cartilage to be inflamed.  Tr. at 48.  Dr. Axelrod said, "I don't have the answer to that.  I don't know."  Id.  His inability to answer this question also causes Dr. Axelrod's credibility to wane.

As for petitioner's assertion in his Motion for Reconsideration and Clarification that he was prescribed low dose prednisone and this was a treatment for autoimmune disease, thus proving he had autoimmune disease, Dr. Axelrod contradicted himself as to whether petitioner had autoimmune disease.  The undersigned said to Dr. Axelrod, "I take it that Mr. Purvis did not have an autoimmune disease."  Tr. at 49.  Dr. Axelrod responded: "Not that was indicated in the chart."  Id.  However, later on, Dr. Axelrod answered in the affirmative to petitioner's counsel's question that petitioner had "an autoimmune-induced discitis."  Tr. at 57.  Dr. Axelrod also said that autoimmune discitis and immune-mediated discitis were the same thing.  Tr. at 58, 59-60.  However, none of the treating doctors diagnosed petitioner with autoimmune disease.  The undersigned takes seriously the opinions of petitioner's treating doctors.

Dr. Axelrod also said that he was "proposing" the vaccine was the cause of petitioner's discitis and "it seemed to involve the L2-L3 disc rather than the other discs," but he could not explain why.  Tr. at 49-50.  This inability further reduces Dr. Axelrod's credibility.

Dr. Axelrod admitted that petitioner's doctors did not do cultures to find out if the cause of his discitis was bacterial.  Tr. at 55.

Dr. Axelrod said he was unaware of any literature or other support for the conclusion that an autoimmune or allergic inflammation can cause discitis as a clinically isolated event.  Tr. at 70.  He also stated that he is unaware of anyone in the medical community who believes that seasonal flu vaccine causes discitis.  Tr. at 86.  Dr. Axelrod could not find any literature or cases reports stating flu vaccine causes discitis.  Tr. at 87.  Dr. Axelrod stands alone in the medical community with the theory that flu vaccine causes discitis.  This solitary opinion detracts from Dr. Axelrod's credibility.

4

Dr. Axelrod agreed with the statement that linear amino acid sequence homology or even similar conformational structure between an exogenous agent and a self-antigen alone are not sufficient to prove that molecular mimicry is the pathogenic mechanism for disease. Tr. at 80-81. This means that Dr. Axelrod's proffered theory of homology of some undetermined amount between the hemagglutinin and neuraminidase in flu vaccine and cartilage is not sufficient to prove that flu vaccine causes disease by homology.

Dr. Axelrod also agreed with the statement that many such homologies exist and the vast majority of these are not associated with biologically relevant autoimmune phenomena or actual human disease. Tr. at 81. This means that Dr. Axelrod's proffered theory of homology is further gutted because most likely, assuming any amount of homology, the homology is biologically irrelevant.

Dr. Axelrod admitted that petitioner's course of prednisone was ineffective. Tr. at 88. Petitioner's assertion in his Motion for Reconsideration and Clarification emphasizes the importance of petitioner's doctor prescribing prednisone, but if indeed petitioner had an autoimmune disease, the prednisone had no effect on this purported autoimmune disease. On the other hand, petitioner received numerous antibiotics: Ciproflox, Keflex, and Cephalexin, and got better afterwards. Tr. at 89. Antibiotics are used to treat infections, not autoimmune diseases. The preferential treatment for petitioner, as both experts agreed, was intravenous antibiotics, but petitioner refused that treatment.

Dr. Axelrod testified that he does not think one can prove a causal relationship between petitioner's influenza vaccine and discitis because there is no reasonable evidence. Tr. at 91. He stated:

> Well, I don't think you can prove it. You don't have – you know,
> you have to have some reasonable evidence, you know, in the data
> that looks at this particular problem in the face of it. So all you can
> really do is look at peripherally things that might connect to each
> other that might cause the problem.

Tr. at 91. In other words, Dr. Axelrod's opinion is based on speculation, which he admits by use of the word "might" which means "possible." Petitioner's burden is to prove a prima facie case by preponderant evidence. 42 U.S.C. § 300aa-13(a)(1)(A). "Preponderance" means "more likely than not" or "probable." "Preponderance" does not mean "possible."

The impression the undersigned got from Dr. Axelrod's testimony is that he was markedly uncomfortable, shifting from a theory of central nervous system attack to peripheral nervous system attack and trying, with a paucity of evidence, to create some theory he could espouse.

5

Dr. Axelrod defined an autoimmune reaction as a reaction to one's own body. Tr. at 98. He said that if someone had a vaccine reaction, it is autoimmune because his or her body is fighting itself. Tr. at 109.

Dr. Axelrod said part of the problem is that we do not have serial films to know what really happened in this case and to understand the time course of petitioner's discitis. Tr. at 99.

Dr. Axelrod recognized that petitioner was on heavy pain medications prior to his vaccination and that narcotics tend to become less and less beneficial. Tr. at 100.

Dr. Axelrod's first expert report in this case stated that his opinion was based on the flu vaccine producing cytokines which breached the blood-brain barrier and entered the brain, resulting in an increase in vasculature, although it can get into the disc just from the bloodstream because then you do not have to deal with the blood-brain barrier. Tr. at 102. Dr. Axelrod said the increased vasculature was likely related to the degenerative spinal disease petitioner had. Id. He said more blood vessels and increased nerves allowed the cytokines to get to the spine. Tr. at 103.

Respondent's expert Dr. Collins was a paragon of clarity compared to Dr. Axelrod's muddled testimony. She was alert, lucid, and well-qualified to deal with the issues in the case. She is board-certified in infectious diseases. Tr. at 113. She sees patients, teaches, and does research. Tr. at 114. She teaches infectious disease to first and second year medical students and at the wards of a hospital. Tr. at 115.

Dr. Collins testified that a vertebral disc is quite separated from nerve tissue. Tr. at 119. She said nerve tissue is only in the spinal cord and leaves the spinal cord out the sides. It goes on either side of the disc, not through the disc. Id.

Dr. Collins said that before petitioner received flu vaccine, his disc degeneration was out of proportion to normal aging. Tr. at 121. The most common type of discitis is an infectious process in which bacteria in the bloodstream seed the vertebral bodies. Tr. at 122. It is not a specific attack of a component of the disc, but the presence of bacteria and immune cells fighting the bacteria that appears as discitis. Id. The vertebral discs do not contain neural tissue from the spinal cord or from the nerve roots. Tr. at 125.

Dr. Collins said that Dr. Axelrod's thesis that an autoimmune process adversely affected petitioner's central nervous system and then affected his disc makes no sense. Tr. at 126. If Dr. Axelrod proposes that the flu vaccine activated microglia to affect the central nervous system, then it would not affect the disc because the disc is not part of the central nervous system and does not have nerves from the central nervous system in it. Id.

Dr. Collins said petitioner's spinal MRI analysis was that he had osteomyelitis/discitis. Tr. at 127. Vertebral osteomyelitis refers to infection of the vertebral bone. Discitis refers to spread of that infection to the disc. Id. There was abnormal irregularity of the endplates of L2-L3. Id. Dr. Collins' opinion is that these MRI findings indicate an osteomyelitis/discitis of an

6

infectious origin.  Tr. at 129.  That was petitioner's treating doctors' opinion as well.  Id.

Dr. Collins said that the approach the doctors took at Lawrence & Memorial Hospital on October 11, 2013 was "the exact approach one would take for somebody who had osteomyelitis/discitis."  Tr. at 131.  That would be admitting the patient, starting intravenous antibodies, and biopsying the tissue.  Id.  They proposed that procedure, given petitioner's lumbar spine MRI, because the doctors thought petitioner had an infectious process.  Id.  Medical literature supports the conclusion that vertebral discitis and osteomyelitis have an infectious pathology.  Id.  Dr. Collins said that usually vertebral osteomyelitis refers to a bacterial infection, not an autoimmune condition.  Tr. at 132.

As for Exhibit 16 which petitioner submitted showing Wegener's granulomatosis mimicking a thoracic spondylodiscitis, Dr. Collins said the lesions in that case were not classic where one has an adjacent vertebral body endpoint degradation with an effect on the intervertebral disc that is between those two vertebral bodies.  Id.  In Exhibit 16, the authors state the morphology and signal intensity of the vertebral bodies and intervertebral discs were within normal limits.  Tr. at 133.  Dr. Collins said that excluded a diagnosis of vertebral osteomyelitis or spondylodiscitis.  In that case report, the authors were not even saying this was a discitis.  Id.

As for Exhibit 17 which petitioner submitted showing spondylodiscitis as the only clinical manifestation of the onset of psoriatic spondyloarthritis, Dr. Collins said again the MRI findings were not classic for osteomyelitis/discitis as can be seen in petitioner's lumbar spinal MRI.  Id.  The case report constituting Exhibit 17 depicts a spinal MRI showing partial hyperintensity, compatible with bone marrow edema, which Dr. Collins said is not the same type of findings as in the osteomyelitis/discitis that petitioner had.  Id.  Despite the MRI findings in the case report constituting Exhibit 17, the patient's doctors were sure this was probably the result of an infection because they treated the patient with antibiotics for three months, and the doctors said that spondylodiscitis usually represents a complication of sepsis and the most involved pathogens are staph aureus in 60 percent of cases and enterobacter in 30 percent of cases.  Tr. at 134.  The authors of the case report constituting Exhibit 17 describe this patient as having an unusual presentation of discitis.  Id. at 134.

Dr. Collins testified that if petitioner's discitis were autoimmune, she would expect his discitis to be part of a greater syndrome rather than a clinically isolated event.  Id.  In the two case reports constituting Exhibits 16 and 17, the observation of the spinal cord changes in one case and the soft tissue changes next to the cord in the other case were both part of larger syndromes, i.e., Wegener's granulomatosis (Exhibit 16) and psoriatic spondyloarthritis (Exhibit 17).  Id.

Dr. Collins testified that, in most cases of discitis, it is common to fail to detect the infection causing it.  Tr. at 135.  Respondent's Exhibit A, tab 3, "Pyogenic osteomyelitis of the spine in the elderly," notes that in the ten cases that the authors discuss, only one patient had an unequivocal source of osteomyelitis while two other patients had known recent infectious illnesses.  Tr. at 135, 136.  Dr. Collins said that petitioner had recurrent prostatitis which might

7

increase his risk of seeding a vertebral body and developing osteomyelitis/discitis. Tr. at 137. She noted that petitioner has had multiple infectious sources and it is hard to pinpoint a particular infectious source in this case. Tr. at 140. Petitioner received antibiotic therapy for 32 days, some of which achieved levels equal to intravenous antibiotics, in particular, Cipro. Tr. at 140, 192. He was also on Keflex for a long time. Tr. at 142. Dr. Collins stated it was impressive how petitioner always seemed to have some infection or other. Tr. at 144-45.

Dr. Collins agreed that petitioner's having multiple infections and re-infections indicates a vulnerability to having osteomyelitis/discitis. Tr. at 146. She stated the more times bacteria were introduced into petitioner's bloodstream, the greater the likelihood he would have a damaged bone. Id. She also stated that because petitioner's anatomy is broken down in his spine due to degenerative disc disease, that "weak link" increases the likelihood of infection. Id. Although Dr. Collins did not select the particular infection that caused petitioner's discitis, she did list the multiple bacterial sources that petitioner had: recurrent prostatitis, skin and soft tissue infections, chronic sinusitis, respiratory infections, and chronic back pain. Tr. at 147-48.

Dr. Collins also stated she is not sure when the onset of petitioner's discitis was. Tr. at 148. In someone with chronic back pain, it is really hard to pinpoint exactly when the discitis happened. Id. She said she does not know how petitioner's expert Dr. Axelrod would know that the onset of petitioner's osteomyelitis/discitis was August 18, 2013. Id. Dr. Collins said that petitioner had back pain before August 18, 2013. Id. The onset could have been prior to the acute worsening. Tr. at 148-49. When the worsening of the back pain began might be hard to pinpoint in someone, such as petitioner, who always has back pain and who was taking oxycodone, methadone, and Flexeril all the time. Tr. at 149. These drugs would knock out petitioner's ability to recognize the acuteness of his pain. Id. Dr. Collins said that petitioner's drugs could have masked the symptoms of his back pain for some time. Tr. at 150. She stated the onset of petitioner's discitis absolutely could have preceded his flu vaccination. Id.

Dr. Collins rejected an autoimmune hypothesis because there is no evidence of neural involvement in the inflammation of petitioner's spine, psoas muscle, and vertebral discs. Tr. at 153. Dr. Collins said she is unaware of any similarities between the hemagglutinin and neuraminidase proteins and GM3 gangliosides. Tr. at 156. Dr. Collins disagreed with Dr. Axelrod's theory that cytokines breached the blood-brain barrier to cause local damage to petitioner's spine. Tr. at 157. If this had happened, she said petitioner would have had a systemic response, involving his whole body, and not just one localized site, the disc, because the disc does not have a blood-brain barrier. Id.

Dr. Collins testified that she was unaware of any significant homology that would induce an autoimmune response between neuraminidase and hemagglutinin and neural structures. Tr. at 158-59. She was also unaware of any homology between the two proteins, hemagglutinin and neuraminidase, in the flu vaccine and tissue in the vertebral disc that would cause an autoimmune response against the disc. Tr. at 159. Dr. Collins said that someone could do Blast searches on a computer and find homologies against different proteins all over the place and they do not cause disease. Id. You can find an immune response against peptides that have

8

homology to human proteins, but the presence of those antibodies in cells does not correlate with disease because those people do not have any symptoms.  Tr. at 159-60.  Those antibodies are not present in a greater amount in many studies in normal controls compared to people who have a disease.  Tr. at 160.

Dr. Collins testified that the timing of an autoimmune condition after an inciting pathogen is introduced into a host body would be a week to 10 days.  Tr. at 161.  Having received prior flu vaccines would not have quickened the reaction to one day.  Tr. at 163.  Dr. Collins explained that a memory response would be composed of quiescent cells because they have not been responding actively to the antigens between the time of the earlier vaccination and the current vaccination.  Id.  There could be a slightly more rapid increase in cells but not to the point of a one-day onset.  Tr. at 164.  Even a three-day onset would be quicker than Dr. Collins would expect.  Tr. at 163-64.  Dr. Collins thinks that petitioner's acute exacerbation of back pain is purely coincidental to his flu vaccination.  Tr. at 167.  She thinks it very unlikely that the vaccine was responsible for petitioner's condition.  Tr. at 167-68.  Dr. Collins stated she believes an infectious process rather than a vaccine reaction is much more likely to have caused petitioner's osteomyelitis/discitis.  Tr. at 168.

Petitioner states in his Motion for Reconsideration and Clarification that he is concerned the undersigned dismissed the case because he failed to show sequelae lasting more than six months.  Mot. at 3 (the pages are not numbered; the undersigned is relying on the pagination that CM-ECF supplies).  The undersigned did not dismiss the petition based on the back pain not lasting more than six months.  Dec. at 11.  The undersigned interpreted the medical records to show that petitioner's abdominal and testicular pain did not last more than six months.  Petitioner quotes a record from a physical therapist dated April 15, 2014 (more than six months after the August 15, 2013 flu vaccination) saying that petitioner was there for pain in his central low back.  Mot. at 5.  Even though the physical therapist lists the history petitioner gave of having pain in his back, abdomen, and testicles the day after he received a flu shot in August 2013, it was not the undersigned's impression that petitioner was seeking physical therapy for his abdomen and testicles on April 15, 2014, but that he was seeking physical therapy for his central low back pain on April 15, 2014.

In light of the above discussion, the undersigned has reconsidered all the evidence and clarified the reasons underlying her decision of July 25, 2017.  The undersigned considers the decision dismissing petitioner's case to be reasonable based on the evidence.  Petitioner's expert Dr. Axelrod was not as credible as respondent's expert Dr. Collins.  The contemporaneous medical records support Dr. Collins' view that a bacterial infection caused petitioner's osteomyelitis/discitis and his treating physicians gave him 32 days of antibiotic treatment for it.  They would have given him intravenous antibiotics and done testing and a biopsy if petitioner had been willing to participate.  Because he walked out of the hospital without the recommended procedures, no one will ever know which bacterium infected his lumbar discs.  This hardly equates to a conclusion that petitioner never had an infectious cause for his discitis, an opinion petitioner has asserted throughout this case and during the trial, even in Dr. Axelrod's testimony.

 

 

 

Dr. Axelrod's testimony is also deficient in that there is no credible evidence that petitioner ever had an autoimmune disease or that flu vaccine played any part in his symptoms beginning one day after vaccination.  Dr. Axelrod agreed that the medical community and the medical literature do not support his thesis that flu vaccine causes discitis.  His assertion that an autoimmune analysis is pertinent to petitioner's discitis is the proverbial attempt to put a square peg into a round hole.  Dr. Axelrod started with an analysis which the undersigned suspects he has used in numerous cases in the Vaccine Program and invented an autoimmune illness where none exists.

This case is still **DISMISSED**.

**IT IS SO ORDERED.**

Dated:  August 18, 2017                                    /s/ Laura D. Millman
                                                                          Laura D. Millman
                                                                          Special Master